MARY G. ROEBLING, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 644–72, 7530–73.     Filed July 7, 1981.

*A. Arthur Davis III* and *Ralph A. Straw, Jr.*, for the petitioners.
*Stephen J. Sokolic*, for the respondent.

DRENNEN, *Judge*: In these consolidated cases,[1] respondent determined deficiencies in petitioner's income tax for the taxable years as follows:

| Year | Deficiency |
| --- | --- |
| 1965 | $18,447.43 |
| 1966 | 20,705.96 |
| 1967 | 54,475.31 |
| 1968 | 11,734.85 |
| 1969 | 20,595.73 |

After concessions by the parties, the issues for decision are:

(1) Whether Trenton Trust Co.'s redemption of its preferred stock B from petitioner in each of the taxable years in issue was "not essentially equivalent to a dividend," within the meaning of section 302(b)(1), I.R.C. 1954;[2] and

(2) Whether, as part of a 1958 plan of recapitalization under section 368(a)(1)(E), Trenton Trust's capitalization of $6 of

---

[1]By order dated Jan. 4, 1980, these cases were consolidated for purposes of trial, briefing, and opinion.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue.

dividend arrearages on each share of its preferred stock B "was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax," within the meaning of section 306(b)(4).

## FINDINGS OF FACT

Some of the facts were stipulated and they are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioner Mary G. Roebling (hereinafter petitioner) resided in Trenton, N.J., when she filed her petition herein. She filed individual income tax returns for each of the taxable years in issue with the District Director for the District of New Jersey. Petitioner reported her income for these years on the cash receipts and disbursements method.

From July 22, 1958, through February 25, 1972, petitioner was chairman of the board of directors of Trenton Trust Co. (hereinafter Trenton Trust or bank). She was president of Trenton Trust from the early 1950's through approximately 1965. Although petitioner had overall responsibility for the operation of Trenton Trust, her primary activities involved public relations, marketing, and the development of new business.

### Background Information

Trenton Trust was a banking corporation organized in 1887 under the laws of the State of New Jersey. From that time through February 25, 1972, it carried on a banking business in the city of Trenton, N.J. Effective February 25, 1972, Trenton Trust merged into National State Bank of Elizabeth, N.J. (hereinafter National State), pursuant to Agreement to Merger between the two banks dated September 28, 1971.

The business and operations of Trenton Trust were subject to supervision, control, regulation, and examination by the Department of Banking and Insurance of the State of New Jersey (hereinafter Department of Banking) and the Federal Deposit Insurance Corp. (hereinafter FDIC).

Petitioner is the widow of Siegfried Roebling (hereinafter Roebling), who died on January 1, 1936. Roebling was a stockholder and director of Trenton Trust in the early 1930's.

In 1931, Roebling owned approximately one-third of Trenton Trust's common stock, then its only class of stock.

During the early 1930's, Trenton Trust experienced financial difficulties. In order to improve its financial position, certain of the bank's directors, including Roebling, gave personal notes totaling approximately $500,000 to Trenton Trust in exchange for certain assets (outstanding loans which were only slowly being repaid) of an approximately equal amount. The assets were delivered to trustees for collection, and any proceeds received were paid to Trenton Trust and applied on the personal notes. Any amounts remaining due on the notes after application of the proceeds were then to be paid by the individual directors.

The preceding plan did not sufficiently improve Trenton Trust's financial position. As a result of an examination of Trenton Trust by the FDIC and in order for Trenton Trust to obtain membership in the FDIC, Trenton Trust entered into negotiations with the Reconstruction Finance Co. (hereinafter RFC) which resulted in RFC's agreeing to lend $2 million to Trenton Trust.

The agreement between Trenton Trust and RFC provided that RFC would loan the money to Trentrusco, a nonactive subsidiary corporation of Trenton Trust, and that Trentrusco would in turn use the $2 million to purchase from the bank shares of a to-be-issued new class of preferred stock, preferred stock A. These shares, together with the assets which the bank directors had previously received for their personal notes and which they were required to deliver to Trentrusco as part of the loan agreement, were then to be pledged to RFC as collateral for the $2 million loan.

As a condition for its loan, RFC required that Trenton Trust raise an additional $2 million of capital from its directors and other interested parties by the issuance of a second new class of preferred shares, preferred stock B.

The loan agreement between RFC and Trenton Trust, as described above, was effected. In order that Trenton Trust could issue the preferred stock A and B, its certificate of incorporation was amended in March 1934 to permit the issuance of 100,000 shares of preferred stock A ($20 par value) and the issuance of 20,000 shares of preferred stock B ($100 par value).

As amended, the certificate of incorporation also provided:

(1) *Dividends.*—Cumulative dividends of 5 percent were payable on the preferred shares, and preferred stock A shares had priority over preferred stock B shares, which in turn had priority over the common stock. As long as any dividends on the preferred stock were unpaid, no other dividends or distributions were payable.

(2) *Net profits application.*—If preferred stock A shares were outstanding, net profits were to be applied in the following order:

(a) 10 percent to a surplus fund;

(b) Preferred stock A dividends;

(c) Preferred stock A retirement fund;

(d) Preferred stock B dividends; and

(e) Common stock dividends and other lawful purposes.

If all preferred stock A shares were retired and preferred stock B shares were outstanding, net profits were to be applied:

(a) 10 percent to a surplus fund;

(b) Preferred stock B dividends;

(c) Preferred stock B retirement fund; and

(d) Common stock dividends and other lawful purposes.

(3) *Retirement of preferred stock.*—Provided that (a) unimpaired capital surplus and undivided profits exceeded $5,400,000 by an amount necessary to effect a contemplated stock retirement, and (b) approval of the commissioner of the Department of Banking could be obtained, preferred stock would be retired by purchase or call whenever $40,000 had been accumulated in a preferred stock retirement fund.

(4) *Voting rights.*—As a general rule, each share of preferred and common stock was entitled to one vote. In the event dividends were in arrears, a formula was provided which increased the voting rights of the preferred shares.

Roebling and certain other directors of Trenton Trust agreed to purchase the $2 million of preferred stock B, with Roebling purchasing 18,700 shares for $1,870,000. When Roebling died in 1936, petitioner acquired these shares from his estate.

Shortly after the infusion of the $4 million of capital into Trenton Trust, governmental agencies determined that such amount was insufficient and they required that an additional

$2 million of capital be raised. This amount was obtained when RFC purchased directly from Trenton Trust an additional $2 million of preferred stock A.

This purchase of additional preferred stock A necessitated another amendment of the bank's certificate of incorporation. As amended, the certificate of incorporation provided in pertinent part:

(1) *Capital stock.*—The authorized capital stock consisted of: 200,000 shares of preferred stock A with a $6 par value and subject to retirement at $20 per share (the original par value); 20,000 shares of preferred stock B with a $20 par value and subject to retirement at $100 per share; and 28,000 shares of common stock with a $10 par value.

(2) *Dividends.*—Dividends were payable under the same terms as previously provided.

(3) *Net profits application.*—This provision remained substantially the same. One change concerned the amounts which would be paid into the preferred stock A and B retirement funds.

(4) *Retirement of preferred stock.*—Provided that (a) unimpaired capital, surplus and undivided profits exceeded $2,710,000 by an amount necessary to effect a contemplated stock retirement and (b) approval of the commissioner of the Department of Banking could be obtained, preferred stock A and B would be retired by purchase or call whenever $80,000 and $40,000, respectively, had been accumulated in the preferred stock retirement funds.

(5) *Voting rights.*—Remained substantially the same as previously provided.

The issuance of the two classes of preferred shares and the characteristics of those shares in terms of preferences, retirements, and dividends were the result of conditions imposed by RFC for the making of the two loans to Trenton Trust. These conditions were approved by the FDIC and Department of Banking.

From 1934 until approximately 1947, RFC maintained an active interest in the management of Trenton Trust. Between 1947 and 1954, RFC assumed a more passive role in the management of Trenton Trust. On February 28, 1940, RFC foreclosed its $2 million loan to Trentrusco due to a default in the payment of dividends on the preferred stock A and took

over ownership of the preferred stock A securing the loan. From 1940 until 1954, RFC held substantially all the preferred stock A of Trenton Trust. By 1954, some of this preferred stock had been redeemed. In 1954, RFC wanted to end its remaining investment in the preferred stock A and petitioner agreed to purchase these shares from RFC.

During the period 1934 through 1958, Trenton Trust retired all but 14,683 of the 200,000 total shares of preferred stock A. These 14,683 shares were either retired or converted into common stock pursuant to a plan of recapitalization which Trenton Trust underwent in 1958. During the period 1934 through 1958, no shares of preferred stock B could be or were redeemed because the certificate of incorporation prohibited any such redemptions while preferred stock A remained outstanding.

### Preferred Stock B Redemptions

In 1958, Trenton Trust adopted a plan of recapitalization which was approved by the necessary Federal and State governmental authorities[3] and two-thirds of Trenton Trust's stockholders. The plan, as adopted and executed, was a recapitalization under section 368(a)(1)(E). In essence, the plan of recapitalization provided that:

(a) The outstanding preferred stock A was to be retired by giving the holders thereof the option of converting such stock into common stock or of having such stock retired at $20 per share.

(b) The outstanding preferred stock B was to be split 2-for-1, and the $12 of dividend arrearages on each share prior to the split was to be capitalized. This resulted in each new share having a par value of $56 (one-half of the original $100 par value plus one-half of the $12 dividend arrearage). Any holder of preferred stock B not agreeing to be bound by the recapitalization plan would have his stock retired.

Holders of the new preferred stock B were entitled to cumulative cash dividends of $2.80 per annum, payable

---

[3]In a 1957 letter to Trenton Trust, the FDIC suggested to the bank that consideration be given to the formulation of a plan that would eliminate both preferred stock A and B and that would provide for common stock in an amount that would bring the bank's capital structure into proper relationship with its deposits.

semiannually. These holders were also entitled to two votes per share if dividends were in default or if the voluntary dissolution of Trenton Trust were at issue. Otherwise the holders of preferred stock B were entitled to one vote per share, the same voting rights as holders of common stock. In the event of receivership, conservatorship, liquidation, dissolution, or a winding up, preferred stock B would have first priority on Trenton Trust's assets to the extent of $56 per share plus unpaid dividends.

(c) The common stock was to be split 2-for-1 and the par value reduced from $10 to $5 per share.

(d) Holders of common stock were given the right to purchase 1 share of new common stock for each 2 shares of common stock held after the 2-for-1 split of the common stock.

The plan also provided for the periodic retirement of the preferred stock B in the fixed amount of $112,000 per year. Trenton Trust was required to create and maintain a sinking fund for the retirement of preferred stock B.

As part of the plan of recapitalization, petitioner, who was then both president and chairman of the board and principal holder of each of the outstanding classes of stock, agreed: (1) To convert not less than 10,825 of her shares of preferred stock A into common stock; (2) not to present for retirement any of her preferred stock B; and (3) not to exercise her rights to acquire additional common stock.

The purpose of the recapitalization was to simplify and strengthen Trenton Trust's capital structure. Additional capital was necessary in order to maintain the proper ratio between capital and bank deposits.[4] The recapitalization was to accomplish its purpose by: Eventually eliminating both the old and new preferred stock B; permitting the resumption of dividends on the common stock which had previously been prohibited because of dividend arrearages on the preferred stock; and raising additional capital of $330,057.46.

The certificate of incorporation, as amended by the plan of recapitalization, provided in pertinent part:

15. *Retirement of preferred stock "B"; conditions.* No preferred stock "B" shall be retired so long as there is any preferred Stock "A" outstanding,

---

[4]For similar reasons, Trenton Trust in 1963 sold $2 million of 5-percent debentures due Sept. 1, 1978, to Connecticut General Life Insurance Co.

unless provision has been made for the retirement of the preferred stock "A," nor shall any preferred Stock "B" be retired without the prior written approval of The Commissioner of Banking and Insurance of New Jersey and the Federal Deposit Insurance Corporation.

16. *Retirement of preferred stock "B"; procedure; rights.* Subject to the provisions of section 15 of this Article Fourth, the Trust Company may at any time, at its election, as expressed by resolution of its Board of Directors, retire the outstanding preferred stock "B" as a whole, or from time to time in part, pro rata or by lot in such equitable manner to carry out the purpose of this section 16 as the Board of Directors of the Trust Company in its discretion shall from time to time determine, by paying for each share to be retired a retirement price equal to $56 per share, plus, in each case, all accrued dividends thereon, whether or not earned or declared, accrued to the date of such retirement, * * * All shares so retired shall be cancelled and shall not be reissued.

17. *Application of net profits.* Subject to the provisions of law now and hereafter from time to time in effect, and subject further to lawful orders and regulations from time to time issued or promulgated by any state or federal officer or agency, so long as any shares of preferred stock "B" remain outstanding, the Trust Company, * * * shall apply its net profits * * * [semiannually]:

(a) to the establishment of such reserves as may be required by law, or as may be lawfully required to be created pursuant to the order or recommendation of any state or federal officer or agency, or as may in the discretion of the Board of Directors, be necessary or advisable;

(b) if * * * the Trust Company's surplus does not equal at least 50% of its capital stock, the Trust Company shall transfer to surplus not less than 10% of its net profits * * * ; but nothing herein shall require a transfer to surplus in excess of an amount sufficient to increase surplus to 50% of capital stock;

(c) to the payment of dividends on the outstanding preferred stock;

(d) to the retirement of not less than $56,000 par value of preferred stock "B":

(e) to the payment of dividends on common stock, and to such other lawful purposes as the Board of Directors may determine.

In connection with the recapitalization, Trenton Trust engaged W. E. Wetzel & Co. (hereinafter Wetzel) for the purpose of assisting the board of directors in preparing the plan of recapitalization and advising it with regard to any matters pertaining to the plan. As part of its services, Wetzel prepared a circular describing the plan which was distributed to the stockholders of Trenton Trust. In that circular and in an advertisement in a local paper concerning the recapitalization, the plan was described as providing for "the periodic retirement of the Preferred Stock B at the rate of $112,000 per year."

The circular further specifically provided in pertinent part:

Based on the dividend and retirement provisions for the Preferred Stock B, as set forth in the Plan, and based on dividends at the rate of $1.50 per share on the common stock, but subject to reserves, as set forth in the amended Certificate of Incorporation, the application of earnings will be as follows:

Net Operating Earnings ................................................ $450,000
Less:
  Dividends at $2.80 per share on Preferred Stock
  B (40,000) shs., $56 par) ............................. $112,000
  Annual requirement for retirement of
  Preferred B ............................................. 112,000      224,000
                                                                                    226,000
  Dividends at $1.50 per share on contemplated
  number of shares of common which will be
  outstanding under Plan—79,185 shares ........... 118,778

On the above basis, earnings available for the Preferred dividends will amount to 4 times Preferred dividend requirements.

Note that the above computation treats retirement of Preferred stock, $112,000 per year, as a charge against earnings. This is not strictly correct. On a true accounting basis this is a retirement of senior capital which inures to the benefit of the common stock. The following shows the relation of total dividend requirements to earnings and the balance remaining for retirement of Preferred stock and other purposes.

Net Operating Earnings ..................................... $450,000
Dividend requirements on preferred stock ................ 112,000
                                                                             338,000
Dividends at $1.50 per share on common stock ........ 118,778
Balance for retirement of Preferred B,[1]
and for Reserves and other Purposes ..................... 219,222

---

[1] Note that the Preferred Stock B is callable at $56 per share, and if sufficient capital funds are available and if the regulating authorities approve, the bank may, if it chooses, retire the Preferred Stock B at a rate faster than $112,000 per year. On the basis of retiring no more than $112,000 a year, the Preferred Stock B will be paid in full in 20 years. If it should become possible, subject to the conditions described above, to apply a total of $224,000 each year to both dividends and retirement of Preferred B, thereby accelerating the payment of the Preferred B by the amount by which total dividend requirements on this stock are reduced, due to retirement, the entire Preferred B would be eliminated in 15 years. If the amount of Preferred Stock B outstanding at the consummation of the Plan is less than $40,000 shares the retirement of this stock will require a shorter time than indicated in this paragraph.

In late 1957, Trenton Trust sought legal advice concerning the tax consequences which might result to holders of preferred stock B in connection with the proposed plan of recapitalization. It was advised that, on the facts presented, the plan should qualify as a tax-free recapitalization, that the

preferred stock B received in exchange for the old preferred stock B (or the old preferred stock B with the changes in its rights effected by amending the corporate charter) should not qualify as section 306 stock, but that it should be assumed that the convertible preferred stock B would be section 306 stock to the extent of one-eleventh of each share (the portion of the share attributable to dividend arrearages).

After the 1958 recapitalization, petitioner had 36,986 shares of preferred stock B. Other than in connection with the recapitalization, she received none of the shares as a distribution from Trenton Trust. She acquired substantially all her shares from the estate of her husband. Petitioner's basis was zero in the preferred stock B received by her under the will of her husband.

Beginning in 1959 and continuing in each year thereafter through 1971, Trenton Trust set aside $112,000 ($56,000 semiannually) of its earnings for the retirement of preferred stock B. With the exception of 1967, all of the amount set aside in each year was not used in that year to redeem shares of preferred stock B. In 1959, 486 shares were redeemed for $27,216. In subsequent years through 1971, with the exception of 1967, 1,000 shares were redeemed in each year for $56,000. In 1967, 3,000 shares were redeemed for $168,000. The preferred stock B shares retired by Trenton Trust were not reissued. Each retirement of shares of preferred stock B required the consent and approval of the FDIC and Department of Banking.

The procedure followed with respect to these redemptions began with the board of director's adoption of a resolution to apply to the governmental agencies for approval to retire a specific number of shares. With the exception of 1959 and 1967, the board requested and received approval to retire not more than 1,000 shares of preferred stock B in each year. In 1959 and 1967, the board requested and received approval to retire not more than 500 and 3,000 shares, respectively. In 1962, the board's request for approval to retire not more than 5,514 shares[5] was denied. Subsequently, the board requested and received approval to retire not more than 1,000 shares

---

[5] As of Dec. 31, 1961, Trenton Trust had set aside $308, 784 in its preferred stock B retirement fund. This amount allowed for the retirement of 5,514 shares at $56 per share.

during 1962. The denial of the board's initial request for 1962 was the only time during the 1959 through 1971 period when the governmental authorities did not approve such a request.

Following receipt of approval to retire preferred stock B shares, a letter soliciting shares for retirement was sent to holders of preferred stock B shares.[6] Thereafter, petitioner offered for retirement such numbers of her preferred stock B shares as would be required to make up the difference between the number of shares to be retired and the number of shares offered by the other stockholders.[7]

The reason for the foregoing procedure with respect to the retirement of petitioner's shares of preferred stock B was to foster good public relations by affording other stockholders an opportunity to recover their money first.

The list below shows the total shares of preferred stock B redeemed during 1959 through 1971 by Trenton Trust and the number of petitioner's shares redeemed.

| Year | Shares redeemed | Shares redeemed personally owned by petitioner | Shares redeemed attributable to petitioner under sec. 318 |
|------|-----------------|------------------------------------------------|-----------------------------------------------------------|
| 1959 | 486   | 0     | --- |
| 1960 | 1,000 | 746   | --- |
| 1961 | 1,000 | 749   | --- |
| 1962 | 1,000 | 565   | --- |
| 1963 | 1,000 | 725   | --- |
| 1964 | 1,000 | 705   | --- |
| 1965 | 1,000 | 700   | --- |
| 1966 | 1,000 | 800   | --- |
| 1967 | 3,000 | 2,161 | 600 |
| 1968 | 1,000 | 364   | 215 |
| 1969 | 1,000 | 37    | 215 |

---

[6]When offering shares for retirement, the stockholders waived the certificate of incorporation provision calling for the retirement of preferred stock B shares on a pro rata or by-lot basis. In 1969, the certificate of incorporation was amended to provide for retirement of preferred stock B "by such other method other than pro-rata or by-lot as may be approved by 80 percent of the holders of preferred stock 'B' outstanding."

[7]Petitioner did not explain why this procedure was not utilized in 1959 to make up the difference between the 486 shares redeemed in that year and the 500 shares which the bank was authorized to redeem.

| 1970 | 1,000 | 290 | --- |
|---|---|---|---|
| 1971 | 1,000 | 0 | 100 |
| | 14,486 | 7,842 | 1,120 |

The redemptions in 1965 through 1969 were, in each year, not substantially pro rata among the stockholders.

In addition to having shares of preferred stock B redeemed, petitioner also sold some shares and she donated others to charities. For the taxable years in issue, petitioner sold and donated the following shares of preferred stock B:

| Year | Shares sold | Shares donated |
|---|---|---|
| 1965 | 40 | 485 |
| 1966[8] | 20 | 363 |
| 1967 | --- | 100 |
| 1968 | --- | [9]230 |
| 1969 | --- | 345 |

It is clear from the summary of petitioner's stockholdings in Trenton Trust, *infra*, that petitioner also disposed of preferred stock B shares by sale and/or donation during the years 1959 through 1971 which are not at issue.

Set forth on pages 44 and 45 in tabular form is a summary of petitioner's stockholdings in Trenton Trust during 1958 through 1972, including shares attributed to her under section 318. For the years 1959 through 1971, petitioner's holdings both immediately before and after the preferred stock B redemptions are shown.

The table on pages 44 and 45 shows the following changes in petitioner's proportionate ownership of preferred stock B and of total voting stock as a result of the redemptions:

---

[8]In addition to showing on her return the sale of 20 shares of preferred stock B and the redemption of 800 shares, petitioner also noted a disposition of 141 shares of preferred stock B. Neither party makes mention of this disposition and we will accordingly not consider it.

[9]The figures for the donated shares were derived from the petitioner's income tax returns. On her return for 1968, a charitable contribution deduction is claimed for donating 275 shares of preferred stock B, including a contribution of 50 shares to St. Francis Hospital. In the statutory notice of deficiency for 1968, respondent disallowed a portion of the claimed charitable deduction on the ground that petitioner only donated 5 shares to St. Francis Hospital. Petitioner has conceded the correctness of respondent's adjustment. Accordingly, we have reduced the figure shown on the return by 45 shares.

| Year | Percentage change in preferred stock B shares | Percentage change in total voting shares |
|------|------|------|
| 1959 | 1.1299 | 0.2280 |
| 1960 | 0.4620 | (0.1497) |
| 1961 | 0.4466 | (0.1580) |
| 1962 | 0.9021 | (0.0117) |
| 1963 | 0.4387 | (0.1512) |
| 1964 | 0.2716 | (0.1569) |
| 1965 | 0.2636 | (0.1627) |
| 1966 | (0.0849) | (0.2561) |
| 1967 | (1.6162) | (1.0957) |
| 1968 | 0.5765 | (0.0713) |
| 1969 | 1.7534 | 0.0870 |
| 1970 | 1.7047 | 0.2272 |
| 1971 | 2.4888 | 0.1065 |

The number of common and preferred shareholders of Trenton Trust during the years 1956 through 1972 were as follows:

| Year | Common | Preferred |
|------|--------|-----------|
| 1956 | 361 | 11 |
| 1957 | 353 | 11 |
| 1958 | 459 | 16 |
| 1959 | 464 | 24 |
| 1960 | 470 | 25 |
| 1961 | 471 | 28 |
| 1962 | 480 | 36 |
| 1963 | 505 | 46 |
| 1964 | 509 | 52 |
| 1965 | 512 | 52 |
| 1966 | 522 | 57 |
| 1967 | 531 | 59 |
| 1968 | 544 | 62 |
| 1969 | 566 | 63 |
| 1970 | 602 | 64 |
| 1971 | 623 | 73 |
| 1972 | 641 | 75 |

Petitioner was by far the largest holder of voting shares in Trenton Trust. For the years 1958 through 1967 (before the 1968 common stock split of 2 for 1), the number of voting shares *personally* owned by petitioner ranged from 62,737 (1958) to 46,920 (1967). The next largest stockholder during the

| Year | Total common shares | Petitioner's[1] common shares | Petitioner's[1] percentage of common shares | Total preferred B shares | Petitioner's[1] preferred B shares | Petitioner's[1] percentage of preferred B shares | Total voting shares | Petitioner's[1] total voting shares | Petitioner's[1] percentage of total voting shares |
|---|---|---|---|---|---|---|---|---|---|
| **1958** | | | | | | | | | |
| 7/22 | 81,387 | 36,583 | 44.9494 | 39,744 | 37,266 | 93.7651 | 121,131 | 73,849 | 60.9662 |
| 12/31 | 81,387 | 32,228 | 39.5985 | 39,794 | 36,986 | 92.9437 | 121,181 | 69,214 | 57.1162 |
| **1959** | | | | | | | | | |
| Before | 81,387 | 32,228 | 39.5985 | 39,794 | 36,368 | 91.3907 | 121,181 | 68,596 | 56.6062 |
| After | 81,387 | 32,228 | 39.5985 | 39,308 | 36,368 | 92.5206 | 120,695 | 68,596 | 56.8342 |
| **1960** | | | | | | | | | |
| Before | 81,387 | 32,128 | 39.4756 | 39,308 | 36,281 | 92.2993 | 120,695 | 68,409 | 56.6792 |
| After | 81,387 | 32,128 | 39.4756 | 38,308 | 35,535 | 92.7613 | 119,695 | 67,663 | 56.5295 |
| **1961** | | | | | | | | | |
| Before | 81,387 | 32,128 | 39.4756 | 38,308 | 35,075 | 91.5605 | 119,695 | 67,203 | 56.1452 |
| After | 81,387 | 32,128 | 39.4756 | 37,308 | 34,326 | 92.0071 | 118,695 | 66,454 | 55.9872 |
| **1962** | | | | | | | | | |
| Before | 81,387 | 32,128 | 39.4756 | 37,308 | 33,298 | 89.2516 | 118,695 | 65,426 | 55.1211 |
| After | 81,387 | 32,128 | 39.4756 | 36,308 | 32,733 | 90.1537 | 117,695 | 64,861 | 55.1094 |
| **1963** | | | | | | | | | |
| Before | 83,014 | 33,099 | 39.8716 | 36,308 | 31,947 | 87.9889 | 119,322 | 65,046 | 54.5130 |
| After | 83,014 | 33,100 | 39.8728 | 35,308 | 31,222 | 88.4276 | 118,322 | 64,322 | 54.3618 |
| **1964** | | | | | | | | | |
| Before | 84,674 | 34,007 | 40.1623 | 35,308 | 28,182 | 79.8176 | 119,982 | 62,189 | 51.8319 |
| After | 84,674 | 34,007 | 40.1623 | 34,308 | 27,477 | 80.0892 | 118,982 | 61,484 | 51.6750 |
| **1965[2]** | | | | | | | | | |
| Before | 86,367 | 33,958 | 39.3183 | 34,308 | 27,027 | 78.7775 | 120,675 | 60,985 | 50.5366 |
| After | 86,367 | 33,958 | 39.3183 | 33,308 | 26,327 | 79.0411 | 119,675 | 60,285 | 50.3739 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1966² | | | | | | | | | |
| Before | 88,094 | 33,953 | 38.5418 | 33,308 | 25,733 | 77.2577 | 121,402 | 59,868 | 49.1639 |
| After | 88,094 | 33,953 | 38.5418 | 32,308 | 24,933 | 77.1728 | 120,402 | 58,886 | 48.9078 |
| 1967² | | | | | | | | | |
| Before | 89,855 | 34,630 | 39.5399 | 32,308 | 24,633 | 76.2443 | 122,163 | 59,263 | 48.5114 |
| After | 89,855 | 34,630 | 38.5399 | 29,308 | 21,872 | 74.6281 | 119,163 | 56,502 | 47.4157 |
| 1968² | | | | | | | | | |
| Before | 179,710 | 68,262 | 37.9845 | 29,308 | 21,752 | 74.2186 | 209,018 | 90,014 | 43.0652 |
| After | 179,710 | 68,262 | 37.9845 | 28,308 | 21,173 | 74.7951 | 208,018 | 89,435 | 42.9939 |
| 1969² | | | | | | | | | |
| Before | 179,710 | 69,170 | 38.4898 | 28,308 | 20,688 | 73.0818 | 208,018 | 89,858 | 43.1972 |
| After | 179,710 | 69,170 | 38.4898 | 27,308 | 20,436 | 74.8352 | 207,018 | 89,606 | 43.2842 |
| 1970 | | | | | | | | | |
| Before | 269,565 | 104,666 | 38.8277 | 27,308 | 20,166 | 73.8465 | 296,873 | 124,832 | 42.0490 |
| After | 269,565 | 105,208 | 39.0288 | 26,308 | 19,876 | 75.5512 | 295,873 | 125,084 | 42.2762 |
| 1971 | | | | | | | | | |
| Before | 269,565 | 103,320 | 38.3284 | 26,308 | 19,201 | 72.9854 | 295,873 | 122,521 | 41.4100 |
| After | 269,565 | 103,320 | 38.3284 | 25,308 | 19,101 | 75.4742 | 294,873 | 122,421 | 41.5165 |
| 1972 | | | | | | | | | |
| 2/24³ | 269,565 | 95,820 | 35.5462 | 25,308 | 18,404 | 72.7201 | 294,873 | 114,224 | 38.7367 |
| 2/26 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] In arriving at the percentages of common and preferred stock held by petitioner, the attribution rules of sec. 318 have been applied and the shares owned by and the shares held in trust for the benefit of petitioner's parents, children, and grandchildren have been included in petitioner's holdings.

[2] In addition to cash dividends, stock dividends were declared on the common stock in 1965 (2 percent), 1966 (2 percent), 1967 (2 percent), 1968 (100 percent) and 1969 (50 percent).

[3] Trenton Trust merged with the National State Bank of Elizabeth, N.J., on Feb. 25, 1972. All of the stock of Trenton Trust, both common and preferred, was redeemed in the merger.

period owned between 7,000 and 11,000 shares. For the years 1968 through 1971, the total of petitioner's voting shares ranged from 77,103 to 105,898. During the same period, the total shares of the next largest shareholder ranged between approximately 10,000 and 23,000. Often during the period 1958 through 1971, the second largest shareholder was Trenton Trust holding shares in trust.

During the years in issue, Trenton Trust had the following net earnings:

| Year | Earnings |
|------|----------|
| 1965 | $814,193.62 |
| 1966 | 1,008,810.53 |
| 1967 | 1,073,562.70 |
| 1968 | 810,109.00 |
| 1969 | 883,169.00 |

The preferred stock B was entitled to dividends of $2.80 per share at all times from July 22, 1958, through February 25, 1972; dividends at that rate were paid during that period and there were no arrearages.

In both 1965 and 1966, the common stockholders of Trenton Trust received dividends of $1.76 per share plus a 2-percent stock dividend. In 1967, 1968, and 1969, the respective cash and stock dividends were: $2 and 2 percent; $1.12 and 100 percent; and $1.12 and 50 percent.

If in the years 1965 through 1969 the amounts used to redeem shares of preferred stock B had instead been paid as additional cash dividends on the common stock, petitioner would have received the following:

| Year | Amount | Amount petitioner received [1] | Amount petitioner would have received [1] |
|------|--------|--------------------------------|--------------------------------------------|
| 1965 | $56,000 | $39,200 | $22,018 |
| 1966 | 56,000 | 44,800 | 21,583 |
| 1967 | 168,000 | 154,616 | 64,747 |
| 1968 | 56,000 | 32,424 | 21,271 |
| 1969 | 56,000 | 14,112 | 21,554 |
|      | 392,000 | 285,152 | 151,173 |

[1] The figures shown in these columns include amounts received for redeemed shares and amounts that would have been received on common shares for stock which petitioner owned and which was attributable to her under sec. 318.

On her income tax returns for each of the years in issue, petitioner, having a zero basis in her preferred stock B shares, reported the entire amount distributed to her in redemption of her preferred shares as long-term capital gain. Similarly, she reported the entire proceeds ($56 per share) from the 1965 and 1966 sales of preferred stock B shares as long-term capital gain.

In the statutory notices of deficiency, respondent determined that the redemptions of petitioner's shares of preferred stock B were essentially equivalent to a dividend and, accordingly, taxable as ordinary income to the extent of earnings and profits. Secs. 301 and 316. Respondent alternatively determined that if the redemptions were not essentially equivalent to dividends, then $6 per share of each redeemed share (attributable to the capitalized dividend arrearages) represented section 306 stock and, accordingly, constituted dividend income. Sec. 306(a)(2).

As a corollary to his alternative determination, respondent also determined for 1965 and 1966 that $6 per share of the proceeds received by petitioner from the sale of shares of preferred stock B resulted from the disposition of section 306 stock and, accordingly, was ordinary income. Sec. 306(a)(1).

OPINION

The Trenton Trust Co. was a banking corporation which, during the years 1958 through 1972, had issued and outstanding both preferred B (hereinafter referred to as preferred stock) and common shares of stock. During each of the years 1959 through 1971, Trenton Trust redeemed a portion of its outstanding preferred stock. In 1972, all of Trenton Trust's outstanding stock, both preferred and common, was redeemed pursuant to the merger of Trenton Trust into another bank.

During the period 1958 through 1972, petitioner owned a considerable number of shares of both the preferred and common stock of Trenton Trust. During each of the years 1960 through 1971, including the years 1965 through 1969 which are at issue herein, some of the preferred stock owned (both individually and constructively) by petitioner was redeemed. On her income tax return for each of the 5 years in issue, petitioner reported the amount received in redemption of her preferred stock as long-term capital gain. In the statutory notice of deficiency, respondent determined that the amounts

received by petitioner in redemption of her preferred stock were taxable as dividends under sections 301 and 316 and, thus, as ordinary income. The issue for decision is whether the amounts received by petitioner were "not essentially equivalent to a dividend," within the meaning of section 302(b)(1), and, thus, taxable as long-term capital gain.

A second issue, concerning the application of section 306 to the sales (in 1965 and 1966) and redemptions of preferred stock is discussed *infra*.

### Preferred Stock Redemptions

Sections 301[10] and 316[11] provide the general rule for the treatment of distributions by a corporation to its shareholders. If the corporation has sufficient earnings and profits, the distribution will be includable in the distributee's gross income and be treated as a dividend.[12]

---

[10]SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

(b) AMOUNT DISTRIBUTED.—

(1) GENERAL RULE.—For purposes of this section, the amount of any distribution shall be—

(A) NONCORPORATE DISTRIBUTEES.—If the shareholder is not a corporation, the amount of money received, plus the fair market value of the other property received.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

[11]SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

[12]Any distribution, or portion thereof, which is not considered a dividend under sec. 316, is treated as a return of capital to the extent of the shareholder's basis in the stock and any excess over basis is treated as gain from the sale or exchange of property. Sec. 301(c)(2) and (3).

One exception to this general rule is provided in section 302(a) for certain corporate distributions if such distributions are in redemption of stock, within the meaning of section 317(b), and if they qualify under section 302(b)(1), (2), (3), or (4).[13] In such situations the redemptions shall be treated as distributions in part or full payment in exchange for stock and, thus, qualify for capital gains rather than ordinary

---

[13]SEC. 302(a). GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

SEC. 302(b). REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) IN GENERAL.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

(B) LIMITATION.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

(C) DEFINITIONS.—For purposes of this paragraph, the distribution is substantially disproportionate if—

(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of—

(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value.

(D) SERIES OF REDEMPTIONS.—This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

(4) STOCK ISSUED BY RAILROAD CORPORATIONS IN CERTAIN REORGANIZATIONS.—Subsection (a) shall apply if the redemption is of stock issued by a railroad corporation (as defined in section 77(m) of the Bankruptcy Act, as amended) pursuant to a plan of reorganization under section 77 of the Bankruptcy Act.

(5) APPLICATION OF PARAGRAPHS.—In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraph (2), (3), or (4) shall not be taken into account. If a redemption meets the requirements of paragraph (3) and also the requirements of paragraph (1), (2), or (4), then so much of subsection (c)(2) as would (but for this sentence) apply in respect of the acquisition of an interest in the corporation within the 10-year period beginning on the date of the distribution shall not apply.

income treatment. If a redemption does not come under one of the four paragraphs of section 302(b), then the redemption shall be treated as a distribution to which section 301 applies. Sec. 302(d).[14]

Section 317(b) states that "stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock." There is no dispute that Trenton Trust's acquisitions of petitioner's shares of preferred stock in each of the years 1965 through 1969 qualified as redemptions within the foregoing definition, thereby satisfying one of the section 302(a) tests.

The issue presented is whether any of the paragraphs of section 302(b) apply. Of the four paragraphs, the only one petitioner relies on is paragraph (1) which applies "if the redemption is not essentially equivalent to a dividend."

Prior to the opinion of the Supreme Court in *United States v. Davis*, 397 U.S. 301 (1970), interpreting section 302(b)(1), there was considerable uncertainty in the lower courts about whether any particular redemption would qualify as an exchange or was essentially equivalent to a dividend. Much of the uncertainty centered on the role a business purpose for the redemption would have on the issue. In its opinion, the Supreme Court settled that question and also laid down other rules for the application of 302(b)(1). It held:

(1) That the attribution rules of section 318(a) are to be applied to all of section 302, including the determination of whether a distribution is "not essentially equivalent to a dividend" under 302(b)(1);[15]

(2) That the redemption of part of the shares of a sole stockholder, both actually or by attribution, is always essentially equivalent to a dividend;

(3) That the business purpose of a transaction is irrelevant in determining dividend equivalency under 302(b)(1); and

---

[14]SEC. 302(d). REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

[15]Petitioners do not argue that the attribution rules do not apply in this case, and we have utilized them in our findings of fact.

(4) That to qualify for preferred treatment under section 302(b)(1), a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation.

See *Grabowski Trust v. Commissioner*, 58 T.C. 650 (1972). The Court also said "If a corporation distributes property as a simple dividend, the effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders. Where a redemption has that same effect, it cannot be said to have satisfied the 'not essentially equivalent to a dividend' requirement of § 302(b)(1)." *United States v. Davis, supra* at 313.

The *Davis* case involved a corporation the capital stock of which was owned by a single family, so under the attribution rules of section 318(a), the taxpayer was considered to be the sole owner of all the stock of the corporation, both the common and the preferred, that was redeemed. Since the *Davis* case was decided, this Court has decided numerous cases involving dividend equivalency, but in most of them a single family owned all or almost all of the stock, and under the attribution rules, the taxpayer was considered to be the sole shareholder. See *Coates Trust v. Commissioner*, 55 T.C. 501 (1970), affd. 480 F.2d 468 (9th Cir. 1973), cert. denied 414 U.S. 1045 (1973); *Grabowski Trust v. Commissioner, supra*; *Niedermeyer v. Commissioner*, 62 T.C. 280 (1974), affd. 535 F.2d 500 (9th Cir. 1976); *Benjamin v. Commissioner*, 66 T.C. 1084 (1976), affd. 592 F.2d 1259 (5th Cir. 1979); *Paparo v. Commissioner*, 71 T.C. 692 (1979); *Metzger Trust v. Commissioner*, 76 T.C. 42 (1981). Where there were stockholders other than the family, the single family held substantial voting control both before and after the redemption. See *Grabowski Trust v. Commissioner, supra*; *Niedermeyer v. Commissioner, supra*; *Benjamin v. Commissioner, supra*. In these cases, the high percentage of voting control both before and after the redemption was thought to preclude a finding that there had been a meaningful reduction in the taxpayer's interest in the corporation.

We do not disagree with the conclusions reached in any of those cases but we do not believe they are conclusive of the result that should be reached here because of the factual distinctions and the differences in circumstances. We are told in *Benjamin* that the task under section 302(b)(1) is to determine whether the transaction by its nature may be

properly characterized as a sale of stock by the redeeming shareholder; and that the determination of whether there was a meaningful reduction in taxpayers' interest in the corporation is a question of fact. See also *United States v. Davis, supra.*

We have little difficulty in determining that the redemptions of preferred stock here involved could by their nature be characterized as a sale of the stock by the redeeming shareholders. The shareholders, many of whom were unrelated to petitioner, were offered the right to have a portion of their shares redeemed at a fixed price each year. They were not forced to redeem during the years before us because petitioner would have redeemed whatever number of her shares were necessary to cover any disparity between the number of shares sought for redemption and the number of shares offered by other stockholders—although presumably the corporation could have called the stock if enough shares were not offered. The shares were not redeemed pro rata; there was apparently no relationship between the number of shares redeemed from a particular shareholder and the total number of shares owned by him. However, looking at the redemptions from the standpoint of petitioner alone, the distributions could also have been essentially equivalent to a dividend.

Before determining whether the redemptions of petitioner's preferred stock have satisfied the *Davis* standard, it is first necessary to define the context in which the redemptions are to be measured. Petitioner contends that a firm and fixed plan existed to redeem all the outstanding preferred stock and that the redemptions in issue must be measured as steps in the eventual redemption of all of petitioner's preferred stock which would result in a meaningful reduction in her interest in the corporation. Respondent contends that the redemptions of petitioner's preferred stock in each of the years in issue must be measured separately against the *Davis* standard since no firm or fixed plan existed of which these redemptions were a part. As an alternative position, respondent argues that even if the Court finds that a firm and fixed plan did exist, we can only look at the redemptions that occurred during 1959 through 1971 and cannot speculate as to what might have occurred in subsequent years but for the 1972 merger. We find little merit in respondent's alternate argument because we are

not concerned here with whether the plan was to redeem all of the preferred stock but with whether the redemptions here involved were steps in a fixed plan that would meaningfully reduce petitioner's interests in the corporation.

In *Niedermeyer*, *Paparo*, and *Benjamin*, this Court recognized that a series of redemptions over a period of time could be taken into consideration in determining whether the redemptions were dividends or exchanges, although in none of those cases did the Court find a plan that qualified. "To constitute a plan, the terms of the arrangement must be firm and fixed and the steps clearly integrated." *Benjamin v. Commissioner, supra* at 1112. In *Paparo*, the steps sought to be integrated were two separate public offerings of stock to finance the redemptions. The Court found that a second offering was not considered when the stock was redeemed and thus was not an integrated step in a plan. In *Benjamin*, the evidence indicated that any understanding about redeeming taxpayer's stock was too vague and indefinite to be a firm plan with fixed conditions. And in *Niedermeyer*, in order to carry out any plan for taxpayer to divest himself of all his stock so as to qualify under section 302(b)(3), the taxpayer had to donate his remaining shares after the redemption. The Court found that he could have changed his mind so there was no fixed plan.

Whether a firm and fixed plan to redeem existed is necessarily a factual determination.[16] See *Bleily & Collishaw, Inc. v. Commissioner*, 72 T.C. 751, 756 (1979), affd. in an unpublished opinion 647 F.2d 169 (9th Cir. 1981); *Leleux v. Commissioner*, 54 T.C. 408 (1970).

---

[16]Questions concerning the existence of a "firm and fixed plan" have most often arisen in connection with inquiries under sec. 302(b)(3) as to whether a shareholder had completely terminated his interest. In *Paparo v. Commissioner*, 71 T.C. 692, 704 n. 10 (1979), the Court left unresolved the question of whether under sec. 302(b)(1) "the terms of the arrangement must be firm and fixed and the steps clearly integrated" in order for more than the redemption in issue to be considered in determining whether sec. 302(b)(1) had been satisfied. In that case, the Court required the taxpayer to prove that "an overall financial plan existed." *Paparo v. Commissioner, supra.* Herein, the parties have litigated the issue in terms of whether a "firm and fixed plan" existed, and we will decide the issue on that basis. Considering that petitioner is arguing that a plan existed to redeem *all* of the preferred stock B (although not all of petitioner's stock interest in Trenton Trust), use of the "firm and fixed" standard seems appropriate. In utilizing the standard in the instant case, however, we do not decide whether as a general rule the same standard applies under sec. 302(b)(1) as under sec. 302(b)(3).

In this case, we think there was a plan to redeem all the preferred stock that was firm and fixed and that the redemptions here involved were integrated steps in that plan so that the redemptions during the years 1965–69 can be viewed as being a part of a plan in determining whether the *Davis* standards are met.

The preferred stock was originally issued to petitioner's husband in 1934 as a requirement of the Reconstruction Finance Corp. in granting a loan to Trenton Trust to keep it from going under. Preferred stock A was issued to the RFC to secure the loan. In 1957, Trenton Trust received a letter from the FDIC suggesting that the bank formulate a plan to eliminate both the preferred stock A and B. In 1958, a plan of recapitalization, approved by the FDIC and the Department of Banking, was undertaken to strengthen and simplify the bank's capital structure by eliminating the preferred stock A and the dividend arrearages on the preferred stock B and raising additional capital through the sale of additional common stock. The plan of recapitalization also reduced the par value of the preferred stock from $100 per share to $56 per share, the latter being one-half the original par value plus $6 of dividend arrearages that were thus capitalized. To carry out the recapitalization, it was necessary to amend the certificate of incorporation of the bank and to obtain the approval of the FDIC and the State banking authorities. Under the amended certificate of incorporation, the preferred stock had voting privileges, was entitled to cumulative cash dividends of $2.80 per share, and had priority on the corporation's assets upon liquidation equal to the par value of the stock. The recapitalization plan also provided for the periodic retirement of the preferred stock in the fixed amount of $112,000 per year, and the bank was required to create and maintain a sinking fund for this purpose. The bank was, however, required to obtain the approval of the Government regulatory agencies before any stock was retired.

For each of the years subsequent to 1958, the bank set aside $112,000 to retire the preferred stock but did not use that amount to retire the stock. With the exception of 1959, when only 486 shares were redeeemed for $27,216, and 1967, when 3,000 shares were redeemed for $168,000, 1,000 shares were redeemed each year for $56,000. In 1962, the board of

directors' request for approval to retire 5,514 shares was denied by the banking authorities.[17] We have no satisfactory evidence of why only 1,000 shares were actually redeemed each year instead of the 2,000 shares called for in the certificate of incorporation, but we do know that $112,000 was set aside for the purpose each year and that the regular $2.80 dividends were regularly paid.

We are mindful of the admonition of the Supreme Court in *Davis* that business purpose is irrelevant in determining whether a distribution is substantially equivalent to a dividend but we do believe the above discussion is relevant to a determination of whether the redemptions were integrated steps in a firm and fixed plan to redeem all of the preferred stock.

While we realize that this redemption plan was subject to the financial condition of the bank and the approval each time of the banking authorities, we think this was about as firm and fixed a plan as a bank could have under the circumstances. See *Bleily & Collishaw, Inc. v. Commissioner, supra*. We do not believe the requirement of a firm and fixed plan for redemptions need be as rigid under the circumstances here involved as would be required in a closely held family corporation situation where the plan could be changed at any time by the actions of one or two shareholders. Compare *Niedermeyer v. Commissioner, supra*, and *McDonald v. Commissioner*, 52 T.C. 82 (1969).

We now must determine whether the redemptions during the years before us, viewed not as individual transactions but as integrated steps in a firm and fixed plan for the retirement of the preferred stock starting in 1959 and continuing each year until the merger in 1972, resulted in a meaningful reduction in petitioner's interest in the corporation. If they do, we think the payments received for the redeemed stock were not essentially equivalent to a dividend within the standards of *Davis* and were taxable as capital gains. The attribution rules of section 318(a) have been applied to the figures we use, the shares redeemed were not those of a sole shareholder, and we have not used business purpose in determining dividend

---

[17]As of Dec. 31, 1961, the sinking fund for retirement of the preferred B shares contained $308,784 which would have retired 5,514 shares at $56 per share.

equivalency, which are the other three standards established by *Davis*. The distributions would not have the effect of a simple dividend if the meaningful reduction is found because there would be no "transfer [of] property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders." *United States v. Davis, supra* at 313. Simple dividends were paid on each share of stock redeemed and the redemptions had a different effect on the shareholders' interests in the corporation, even though it might have been small on a transactional basis.

In testing for dividend equivalency in the wake of *Davis*, courts have focused on how the redemption affected the taxpayer-shareholder's ability to control (through voting stock) the corporation and right to share in corporate earnings (through dividends) and in corporate assets upon liquidation. See, for example, *Grabowski Trust v. Commissioner, supra; Miele v. Commissioner*, 56 T.C. 556 (1971), affd. per curiam 474 F.2d 1338 (3d Cir. 1973), cert. denied sub nom. *Albers v. Commissioner*, 414 U.S. 982 (1973).

After the recapitalization of Trenton Trust in 1958, petitioner owned 32,228 of the 81,387 or 39.60 percent of the shares of common stock outstanding, and 36,986 of the 39,794, or 91.94 percent of the shares of preferred stock outstanding. This gave her a total of 69,214 out of 121,181, or 57.12 percent, of the total voting shares outstanding.[18] After the redemption in 1969, petitioner owned 69,170 out of 179,710, or 38.49 percent, of the total common shares outstanding,[19] and 20,436 of the 27,308, or 74.83 percent, of the shares of preferred stock outstanding. This gave her a total of 89,606 of the 207,018, or 43.28 percent, of the total voting shares outstanding.[20]

The redemptions of preferred stock during the years 1965–69, which are the years before us, resulted in decreasing petitioner's percentages of total voting stock from 50.54-percent preredemption in 1965 to 43.28-percent postredemption in 1969.

In *Himmel v. Commissioner*, 338 F.2d 815 (2d Cir. 1964),

---

[18]The attribution rules of sec. 318 have been applied in arriving at these figures.

[19]In addition to cash dividends, stock dividends were declared on the common stock in 1965 (2%), 1966 (2%), 1967 (2%), 1968 (100%), and 1969 (50%).

[20]Petitioner made gifts to charities of some of her stock from time to time.

revg. 41 T.C. 62 (1963), decided before the *Davis* case, the Appellate Court said at 817:

> Ownership of stock can involve three important rights: (1) to vote, and thereby exercise control, (2) to participate in current earnings and accumulated surplus, and (3) to share in the assets on liquidation.

The court also noted that "The hallmarks of a dividend, then, are pro rata distribution of earnings and profits *and* no change in basic shareholder relationships." *Himmel v. Commissioner, supra* at 817. The weight to be given to the evaluation of each separate right involved in the ownership of stock will vary from case to case.

While in this case, where the bank was subject to so much governmental regulation concerning its financial structure and there were more than 500 stockholders, we do not find voting control to be a very weighty factor (compare *Rickey v. United States*, 427 F. Supp. 484 (W.D. La. 1976), affd. 592 F.2d 1251 (5th Cir. 1979), and *Neidermeyer v. Commissioner, supra*), we nevertheless think that the reduction in petitioner's voting rights as a result of the redemptions was meaningful. Petitioner owned a considerably higher percentage of the preferred stock than she did of the common. If, according to plan, all of the preferred stock was redeemed, petitioner would have owned less than 40 percent of the voting stock outstanding.[20] Due to the redemptions that actually occurred between 1959 and 1969, and a split of the common stock, petitioner's percentage of voting stock dropped from almost 60 percent to slightly more than 43 percent, which meant that she no longer owned a majority of the voting stock. During the years before us, her percentage of voting stock dropped from slightly above 50 percent, a majority, to 43 percent. Such a reduction has been considered meaningful. *Sorem v. Commissioner*, 334 F.2d 275 (10th Cir. 1964); *Estate of Squier v. Commissioner*, 35 T.C. 950 (1961).

The effect of the redemptions on petitioner's right to share in the earnings and profits of the bank was that she gave up the right to $2.80 in dividends on each share of her preferred stock that was redeemed, which was cumulative. If the

---

[20]Respondent does not deny that if all of petitioner's preferred stock had been redeemed it would have caused a meaningful reduction in petitioner's interest in the corporation.

earnings and profits were high, and the regulatory authorities permitted it, petitioner might have been able to recoup some of these lost dividends out of higher dividends on the common stock. However, this would not be pro rata for petitioner because she owner a smaller percentage of common stock than she did of the preferred. Furthermore, if the earnings and profits were not good, the priority accorded the dividends on the preferred stock would take on more importance.

The redemptions of petitioner's preferred stock also reduced meaningfully petitioner's rights to share in the assets of the corporation. The shareholders of preferred stock were entitled on liquidation to payment of $56 per share plus all unpaid dividends prior to any payment to the holders of the common stock. Thus, the retirement of all the preferred stock held by petitioner in 1958 meant a reduction in her priority right to the assets of the bank on liquidation of over $2 million; and the redemptions in the years before us reduced her rights to the assets by $227,472. Here again the reduction in the preferred stock outstanding would probably increase the rights of her common stock in the assets, but it was not pro rata and the common stock had no priority. The absence of pro rata redemptions of all shareholders' interests in a corporation such as Trenton Trust would make it very difficult to conclude that the redemptions here involved were essentially equivalent to dividends, absent some evidence that petitioner exercised her voting rights in some manner to obtain a benefit for herself. We have no such evidence. The circumstances in this case distinguish it from many of the other cases cited above which have found dividend equivalency in redemptions by closely held family corporations.

We conclude that the redemptions of petitioner's preferred stock during the years before us were "not essentially equivalent to a dividend" within the meaning of section 302(1)(b), and the amounts received therefrom are taxable as capital gains.

### Section 306 Stock

The remaining issue is whether the distributions received on redemption of the preferred stock and the proceeds of two sales of the preferred stock in 1965 and 1966 should be taxed as ordinary income under section 306 to the extent of the capitalized dividend arrearages of $6 per share. Prior to the

recapitalization of Trenton Trust in 1958, the preferred stock had a par value of $100 per share and there were dividend arrearages of $12 per share. As a part of the plan of recapitalization, the preferred stock was split 2 for 1, and the dividend arrearages were capitalized and added to the par value of the stock. As a result, each share of the new preferred stock had a par value of $56 per share, of which $6 represented the arrearages.

Under section 306(a), if a shareholder sells or otherwise disposes of section 306 stock, the amount realized shall be treated as a distribution to which section 301 applies if it is a redemption, or as ordinary income if the disposition is not a redemption. Petitioner does not argue that the preferred stock received by petitioner in the recapitalization was not section 306 stock to the extent that it represented the dividend arrearages that were capitalized. Petitioner does argue, however, that section 306(a) does not apply because of the exception contained in section 306(b)(4), that if it is established to the satisfaction of the Secretary that the distribution, and the disposition or redemption, was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax, section 306(c) does not apply.[21]

In light of the language of the statute, "if it is established to the satisfaction of the Secretary," petitioner has a heavy burden of proof on this issue. See *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896 (1979), affd. without published opinion 642 F.2d 1211 (5th Cir. 1981).

We have very little evidence as to why the dividend arrearages were capitalized, except that it was necessary to take care of the arrearages in some way to make the common stock more attractive. We do not know whether other means of taking care of the arrearages were considered. We do know from the correspondence between the bank and its legal counsel, that the possibility of unfavorable tax treatment when the stock was sold or redeemed was considered. Unlike in a determination with respect to dividend equivalency under section 302(b)(1) where business purpose cannot be taken into

---

[21]The parties agree that for purposes of this issue, $6 of the proceeds of the redemption and/or sale of each share of stock is involved.

consideration under the *Davis* case, "purpose" is the touchstone of this exception provision.

We find no evidence that capitalizing the dividend arrearages had as its principal purpose the avoidance of Federal income taxes. On the other hand, we have no evidence that the principal purpose of this particular provision in the recapitalization plan was not the avoidance of Federal income tax. Objectively, petitioner or her advisers knew that if the arrearages were capitalized and the stock was subsequently redeemed according to the plan, or if the stock was sold, and respondent did not question reporting the proceeds as gain on the sale of a capital asset, there would be a conversion of ordinary income into capital gain.

Under the circumstances, we cannot find, and respondent has not been satisfied, that the distribution, and the disposition or redemption, of that portion of each share of the preferred stock representing the dividend arrearage "was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax."

Hence, the exception contained in section 306(b)(4) relied on by petitioner is not available to petitioner, and $6 of the proceeds from the redemption or sale of each share of preferred stock received by petitioner during the years before us is taxable as ordinary income.

*Decisions will be entered under Rule 155.*