MARY ARNOLD SCHOELLKOPF JOHNSTON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17069–79.     Filed September 24, 1981.

*William E. Collins* and *Thornton Hardie III*, for the petitioner.

*Linda L. Wong*, for the respondent.

EKMAN, *Judge*: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ending December 31, 1976, in the amount of $8,088.38. The issue for decision is whether $28,750 received by petitioner in redemption of a portion of her shares in a closely held corporation should be treated as a capital gain pursuant to sections 302(a) and 302(b)(1), I.R.C. 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Mary Arnold Schoellkopf Johnston resided in Dallas, Tex., at the time her petition herein was filed. Her Federal income tax return for 1976 was filed with the Internal Revenue Service Center in Dallas, Tex., under the name Mary Arnold Schoellkopf. In 1979, petitioner married William C. Johnston.

Petitioner and Hugo W. Schoellkopf, Jr. (hereinafter Buddy), were married on October 24, 1942. On May 13, 1973, after nearly 31 years of marriage, petitioner and Buddy were divorced. They had two children, Hugo and Harriet.

In anticipation of the divorce, petitioner and Buddy entered into a property settlement agreement on May 11, 1973. Under the terms of the agreement, 3,327 shares of Buddy Schoellkopf Products, Inc. (hereinafter BSP), owned by petitioner and Buddy as community property, were partitioned between them, with petitioner receiving as her sole and separate property 1,695 shares.

---

[1]Petitioner has conceded that she will owe a deficiency of $1,702.20 should she prevail in this case. This is a minimum tax based on capital gain as an item of tax preference.

Petitioner would have preferred to have received cash and other income-producing property in lieu of the BSP shares. Buddy was president of BSP at the time of the divorce, and petitioner did not want her finances to be subject to Buddy's control. However, the value of the 3,327 BSP shares owned by petitioner and Buddy constituted approximately 75 to 85 percent in value of the entire community property estate; thus, it was impossible for petitioner to receive her portion of the community estate without retaining some BSP stock.

To create a market in which petitioner could liquidate her BSP interest, Buddy agreed in the property settlement agreement to purchase 657 of her BSP shares after court confirmation of the final divorce decree. In addition, petitioner, Buddy, Hugo, and BSP entered into a stock agreement dated May 11, 1973, which provided that each year as of November 30, commencing November 30, 1973, an independent audit of BSP would be made to determine the book value of each share of stock. Thereafter, on March 1 of each year, commencing March 1, 1974, petitioner was obligated to offer 40 shares of BSP stock to Buddy for cash at the predetermined book value; if Buddy failed to purchase those shares, she was obligated to offer the shares to Hugo; if he did not purchase, and if Buddy and Hugo failed jointly to designate some other individual to whom the shares would be offered, then BSP was obligated to purchase the offered shares from petitioner for cash.[2] Under the stock agreement, Buddy was appointed petitioner's proxy and attorney-in-fact to vote her BSP shares solely in a fiduciary capacity.

Immediately after the divorce and purchase by Buddy of 657 of petitioner's BSP shares, the 5,348 outstanding shares of BSP were owned as follows:

---

[2] The portion of the stock agreement which creates petitioner's and BSP's obligations reads:

"At March 1 of each year, commencing March 1, 1974, [petitioner] *shall* offer to [Buddy] 40 shares of the capital stock of [BSP] owned by her at a per share price, payable in cash, equal to the book value of such share as of the preceding November 30. If [Buddy] has not purchased such shares within ten (10) days, such shares *shall* be offered at the same price and on the same terms to [Hugo] or to such other person or persons as are designated in writing by [Buddy] and [Hugo], jointly. If such shares have not been purchased from [petitioner] by March 20, [BSP] *shall* on such date purchase such shares at said book value for cash. [Emphasis added.]"

| | | |
|---|---|---|
| Buddy | 42.80 | percent |
| Petitioner | 19.41 | percent |
| Hugo | 3.18 | percent |
| Harriet | 2.13 | percent |
| Unrelated persons | 32.48 | percent |
| Total | 100.00 | percent |

Within 2 months after the divorce, Buddy resigned from BSP and has not returned to an active role in the company. Hugo, who had been vice president of BSP, assumed the presidency upon his father's resignation. In October 1974, he purchased his father's 42.80-percent interest in BSP, thus increasing his total direct interest in BSP to 46.09 percent. At the time of trial, he was still president of BSP and owned a 47.49-percent direct interest in the company.

In 1974, petitioner sequentially offered 40 BSP shares to Buddy, Hugo, and BSP. Neither Buddy nor Hugo purchased those shares, nor did BSP purchase them as the stock agreement obligated it to do. In 1975, she again offered 40 shares to Buddy, Hugo, and BSP, in turn, and again, none of the shares so offered were purchased. During 1974 and 1975, she had sufficient income from other sources on which to live.

In each of the years 1976, 1977, and 1978, BSP redeemed 40 of its shares from petitioner after Buddy and Hugo declined to purchase them. In 1979, petitioner again offered 40 BSP shares as provided for in the stock agreement, but did not enforce her right to have BSP redeem those shares after Buddy and Hugo declined to purchase them. At that time, BSP was experiencing financial difficulties. In 1980, after Buddy and Hugo declined, BSP did not redeem the 40 shares she offered to it. Under the stock agreement, it had no obligation to do so, since its financial condition had further deteriorated to the point that a redemption would have violated its loan agreements with an outside lender.[3]

The series of purchases and redemptions of the BSP shares

---

[3] In 1968, BSP, as borrower, entered a note purchase agreement with the Prudential Insurance Co. of America. The stock agreement provided that BSP could not use funds to redeem its shares unless the funds remaining in BSP after such redemption were sufficient to satisfy its obligations under the note purchase agreement.

among the Schoellkopf family members from 1973 to 1978 was as follows:

SCHOELLKOPF FAMILY OWNERSHIP OF BSP

| Year of ownership | Event | Buddy | Hugo | Petitioner | Shares outstanding |
|---|---|---|---|---|---|
| 1973 | Immediately following divorce | 1,632 | 170 | 1,695 | 5,348 |
| 1973 | After Buddy purchased 657 shares from petitioner | 2,289 | 170 | 1,038 | 5,348 |
| 1974 | No redemptions or purchases | 0 | [1]2,465 | [1]1,032 | 5,348 |
| 1975 | No redemptions or purchases | 0 | [1]2,483 | [1]1,014 | 5,348 |
| 1976 | After BSP redeemed 40 of petitioner's shares | 0 | 2,483 | 974 | 5,308 |
| 1977 | After BSP redeemed 40 of petitioner's shares | 0 | 2,483 | 934 | 5,268 |
| 1978 | After BSP redeemed 40 of petitioner's shares | 0 | 2,483 | 894 | 5,228 |
| 1979 | No redemptions or purchases | 0 | 2,483 | 894 | 5,228 |
| 1980 | No redemptions or purchases | 0 | 2,483 | 894 | 5,228 |

[1]Petitioner made gifts to Hugo Schoellkopf of 6 shares in 1973 and 18 shares in 1975.

At no time has petitioner followed BSP's financial condition, voted BSP stock, or participated in BSP's management. Prior to the divorce, Buddy handled petitioner's business affairs. During the divorce proceedings, Hugo took his mother's side and began managing her business affairs, and he has continued to manage her assets since that time.

For the taxable year ending December 31, 1976, petitioner reported as a capital gain the $28,750 she received from BSP in redemption of 40 BSP shares. On September 26, 1979, respondent sent to her a statutory notice of deficiency based upon his determination that the $28,750 she received was a dividend taxable as ordinary income.

## OPINION

Respondent argues that petitioner is not entitled to treat as capital gain the amount she received from BSP in 1976 for the transfer to it of 40 shares of its stock because that distribution was essentially equivalent to a dividend, and, thus, properly treated as ordinary income. Petitioner contends that the amount she received from BSP was a distribution in redemption of her stock which was not essentially equivalent to a dividend, and which qualified for treatment as a distribution made in part or full payment in exchange for her stock. The parties agree that BSP's acquisition of 40 shares of its stock

from petitioner in exchange for $28,750 is a redemption within the meaning of section 317(b).

Historically, there has been much debate over the proper application of section 302(b)(1) to redemptions. The Supreme Court resolved some of that uncertainty in *United States v. Davis*, 397 U.S. 301 (1970), which held that the business purpose for which a redemption is made is not relevant to whether section 302(b)(1) protects such redemption from dividend equivalency. The Court also held that (1) the section 318(a) attribution rules are applicable to section 302(b)(1), and (2) a taxpayer who is the sole shareholder both before and after a redemption can never use section 302(b)(1) to avoid dividend treatment. According to *Davis*, the appropriate test of whether a redemption is essentially equivalent to a dividend is whether that redemption fails to "result in a meaningful reduction of the shareholder's proportionate interest in the corporation." *United States v. Davis, supra* at 313.

The threshold inquiry under *Davis* is whether there has been any reduction in a shareholder's proportionate interest in the redeeming corporation. As *Davis* noted, a sole shareholder who remains so can never reach the threshold. Similarly, a shareholder to whom all of a corporation's stock is attributed under section 318(a), and who does not meet the termination-of-interest safe harbors of sections 302(b)(3) and 302(c), cannot satisfy this first step.

Once it can be shown that a shareholder experienced *some* reduction in proportionate corporate ownership, however small, the second inquiry under *Davis* is whether that reduction was "meaningful." See *Benjamin v. Commissioner*, 66 T.C. 1084 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). Case law following *Davis* has sought to define the elements which make a reduction "meaningful," and the regulations specify that the facts and circumstances of each case will determine whether a distribution in redemption of stock is essentially equivalent to a dividend within the meaning of section 302(b)(1). Sec. 1.302–2(b), Income Tax Regs. See also *Roebling v. Commissioner*, 77 T.C. 30 (1981). In applying section 302(b)(1), courts have considered a decrease in the redeeming shareholder's voting control to be the most significant indicator of a "meaningful" reduction. See *Paparo v. Commissioner*, 71 T.C. 692 (1979); *Benjamin v. Commissioner, supra; Niedermeyer v. Commission-*

*er*, 62 T.C. 280 (1974), affd. 535 F.2d 500 (9th Cir. 1976), cert. denied 429 U.S. 1000 (1976); *Grabowski Trust v. Commissioner*, 58 T.C. 650 (1972). Other factors which point against dividend equivalency are reductions in the rights of redeeming shareholders to share in corporate earnings or to receive corporate assets upon liquidation. See *Roebling v. Commissioner, supra*; *Grabowski Trust v. Commissioner, supra.*

The 1976 redemption of petitioner's BSP shares satisfied the threshold test of *Davis.* Her ownership of BSP common stock declined from 67.52 percent to 67.28 percent, a decrease of 0.24 percent.[4] She does not argue that this 0.24-percent reduction in ownership of BSP shares was, by itself, meaningful. Instead, she argues that the reduction, combined with her sale of 657 shares to Buddy in 1973, and other decreases in her stock interest after 1973 pursuant to the stock agreement were circumstances together sufficient to constitute an overall plan of meaningful reduction in her proportionate BSP interest, and thus sufficient to prevent the 1976 redemption from being essentially equivalent to a dividend.

Several cases support petitioner's theory that a redemption which results in a reduction of a shareholder's proportionate interest, but which does not qualify for sale or exchange treatment under section 302(b) because it is not meaningful by itself, may nonetheless avoid dividend treatment if it constitutes a step in a plan of redemption which, as a whole, meets section 302(b) requirements. See *Roebling v. Commissioner, supra*; *Paparo v. Commissioner, supra*; *Benjamin v. Commissioner, supra*; *Niedermeyer v. Commissioner, supra.* In *Paparo*, a single redemption failed to satisfy any of the three section 302(b) conditions for exchange treatment, but we stated that

---

[4]Petitioner, Hugo, and Harriet owned, in 1976, the following percentages of the BSP stock then outstanding:

|  | Before redemption | After redemption |
|---|---|---|
| Hugo | 46.43 percent | 46.78 percent |
| Harriet | 2.13 percent | 2.15 percent |
| Petitioner | 18.96 percent | 18.35 percent |
| Total | 67.52 percent | 67.28 percent |

All of the remaining shares of BSP stock were owned by persons unrelated to any member of the Schoellkopf family. If the attribution rules had not been applicable, petitioner's interest would have been reduced 0.61 percent by the 1976 redemption, from 18.96 percent to 18.35 percent.

the redemption might qualify under section 302(b)(1) if it were "but one step in an overall plan to redeem petitioners' stock." *Paparo v. Commissioner, supra* at 703. However, we failed to find that a plan existed since taxpayers had not contemplated later redemptions at the time the first redemption was made. *Paparo v. Commissioner, supra* at 704. Similarly, in *Benjamin,* we found that any agreement to redeem taxpayer's stock in a series of steps was in the nature of an afterthought, and was too vague and indefinite to qualify as a firm plan with fixed conditions. *Benjamin v. Commissioner, supra* at 1113–1115. See also *Niedermeyer v. Commissioner, supra.*

Recently, in *Roebling,* we found that a series of redemptions was part of a firm and fixed plan under which the taxpayer's proportionate interest in a corporation would be meaningfully reduced, and, thus, each challenged redemption in the series qualified under section 302(b)(1) as a section 302(a) exchange. The redemptions of preferred stock had been undertaken upon the recommendation of the FDIC, and were approved by the FDIC and State banking authorities. The plan allowed the corporation, a bank, to retire annually preferred stock, most of which was owned by one shareholder, at a fixed dollar amount. While the bank retired fewer shares annually than it was authorized to retire, we felt that the overall redemption plan was as firm and fixed a plan as a savings bank could make because it was subject to prior Government regulatory agency approval and because there were more than 500 shareholders affected by the redemptions. We cautioned, however, that the requirements for a firm and fixed plan of redemption would be more rigidly applied in the situation of a closely held family corporation "where the plan could be changed at any time by the actions of one or two shareholders." *Roebling v. Commissioner, supra* at 55.

Petitioner's case faces us with just such a situation. Several reductions in her proportionate BSP interest occurred through redemptions made between 1973 and 1978, thus satisfying the threshold test of *Davis.* We must determine whether those redemptions were so closely integrated with and related to one another that together they constituted an overall plan for a meaningful reduction in her BSP interest. Only if we so find may we conclude that the 1976 redemption was not essentially equivalent to a dividend.

The 1976 redemption was made pursuant to a written stock agreement which, on its face, created a firm and fixed obligation for the annual redemption of 40 of petitioner's shares. Pursuant to that stock agreement, petitioner had an annual obligation to put 40 BSP shares to Buddy and Hugo, and if neither purchased, BSP was obligated to redeem those shares. Despite the mandatory language of the stock agreement, no redemptions or sales occurred during the first 2 years after the stock agreement took effect. Although petitioner put 40 shares to Buddy, Hugo, and BSP, in 1974, and again in 1975, her shares were neither purchased nor redeemed, nor did she enforce the company's redemption obligation. In 1976 through 1978, her shares were redeemed as anticipated by the agreement. However, in 1979, BSP again failed to satisfy its obligation to redeem her shares after Buddy and Hugo had declined to purchase them; and again, she did not attempt to enforce BSP's obligation. In 1980, BSP did not redeem her shares, but it had no obligation to do so under the terms of the stock agreement.

This chain of events illustrates the situation anticipated by *Roebling*: a plan of redemption, initially obligatory, is changed by the actions of one or two shareholders. There may be circumstances in which a shareholder's failure to enforce her corporation's obligation to redeem shares will not disqualify an otherwise firm and fixed plan of redemption from section 302(b)(1) treatment; however, we do not have such a case before us. Petitioner had the burden of disproving the correctness of respondent's determination that the redemption was essentially equivalent to a dividend (Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933)), but did not come forward with probative evidence to discharge that burden.

Petitioner made no attempt to enforce BSP's redemption obligations in 3 of the 6 years during which her rights under the stock agreement had been enforceable. Nor did she adduce adequate reasons for her failure to do so. In 1974 and 1975, the record shows us merely that she had income from other sources sufficient for her needs. Apparently, she was content to maintain her interest in BSP if she could satisfy her living expenses with other funds. When stock redemptions are made contingent upon a shareholder's needs, future reductions in

that shareholder's proportionate interest in a corporation are conjectural and speculative, and are not part of a fixed plan.

Petitioner's failure to enforce BSP's obligation in 1979 further convinces us that there was no firm and fixed plan. While the record shows that BSP was experiencing financial difficulties in 1979, it does not show why petitioner chose not to enforce BSP's redemption obligation. She has admitted that she did not follow BSP's financial condition and, after the divorce, relied upon Hugo for the handling of her business affairs. We infer from the record that she made no personal evaluation of BSP's financial position when deciding whether or not to enforce BSP's obligation, but instead deferred to Hugo's judgment. In 1979, Hugo believed that forcing BSP to redeem his mother's shares would jeopardize the financial security of the company. While we have no way of assessing the reasonableness of Hugo's business judgment, we note that he was majority shareholder as well as president of BSP.[5] Petitioner was not likely to enforce the stock agreement against Hugo's counsel, particularly when he had taken her side during the divorce and was managing her business affairs. We have before us a family arrangement in which petitioner relied upon the advice of her son before she asserted her rights. When a closely held family corporation does not fulfill its redemption obligations, and when the redeeming shareholder fails to enforce the company's obligation and relies upon an interested party for financial advice, the company's redemption obligation cannot be viewed as part of a firm and fixed plan.

Petitioner asks us to ignore the 3 years in which BSP failed to redeem its shares and she failed to enforce its obligation. She asks us rather to consider the mandatory language of the stock agreement, Buddy's purchase of 657 shares from petitioner, and BSP's redemptions in 1976, 1977, 1978, and failure to redeem in 1980, all pursuant to the stock agreement, as convincing evidence of a firm and fixed plan of redemption. However, we cannot ignore the 3 years out of 6 when no redemption occurred. Moreover, we are unable to ignore the

---

[5]Hugo is considered to own his mother's BSP shares under sec. 318(a). Thus, in 1979, his 2,483 shares plus petitioner's 894 shares equaled 64.59 percent of the 5,228 BSP shares outstanding.

evidence which strongly suggests that BSP's paper obligation was treated by all parties as no more than an interfamily means of providing petitioner with income when and as she needed it.

We therefore find that no firm and fixed plan of redemption existed, and thus we need not reach the question of whether a meaningful reduction of petitioner's proportionate BSP interest would have resulted had there been such a plan. Accordingly, we hold that petitioner is not entitled to treat the amount she received in 1976 from BSP as a distribution in part or full payment in exchange for BSP's shares.

*Decision will be entered for the respondent.*