GLACIER STATE ELECTRIC SUPPLY CO., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4420–81.    Filed May 23, 1983.

*Robert J. Law* and *Ward E. Taleff*, for the petitioner.
*Thomas N. Thompson*, for the respondent.

DAWSON, *Judge*: Respondent determined deficiencies in petitioner's Federal income taxes for the years 1976 and 1977 in the amounts of $7,350.71 and $38,943.17, respectively. Concessions have been made by the parties. The issues remaining for decision are:

(1) Whether the step transaction doctrine should be applied to treat a contemporaneous redemption of a portion of the stock of petitioner's subsidiary and a redemption of some of its own stock as a distribution of the subsidiary stock to the estate of a deceased shareholder of petitioner, followed by a redemption of that distributed stock directly from the estate.

(2) If the step transaction doctrine is inapplicable, whether the distribution to the petitioner from the subsidiary is to be treated as essentially equivalent to a dividend as determined under the provisions of section 302.[1]

---

[1]Unless otherwise indicated, all section references shall be to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

Glacier State Electric Supply Co. (hereinafter referred to as Glacier State or petitioner) is a corporation which maintained its principal place of business in Great Falls, Mont., at the time of the filing of its petition herein. Petitioner's corporate income tax returns for the years involved were timely filed with the Internal Revenue Service Center at Ogden, Utah.

Petitioner was incorporated in 1946 by Donald P. Rearden (hereinafter Rearden) and J. Kenneth Parsons (hereinafter Parsons). One hundred ninety shares of common stock were issued by Glacier State at its incorporation: 94 each to Rearden and Parsons, and 1 each to their wives.[2] Parsons was president of Glacier State and Rearden was vice president.

Business was good. Wishing to expand, Parsons and Rearden, through petitioner, joined with Arthur E. Pyle (hereinafter Pyle) to establish the Glacier State Electric Supply Co. of Billings (hereinafter GSB). GSB was organized and incorporated in 1953. Upon incorporation, GSB issued 339 shares of stock, 1 share each to Pyle, Parsons, and Rearden; with the remaining 336 shares held by petitioner. Parsons, Rearden, and Pyle were named as officers in GSB, with Pyle designated as that corporation's president. Pyle was allowed to buy into GSB (from Glacier State) as part of his business arrangement with Parsons and Rearden. In 1955, the stock of GSB was held as follows: Rearden and Parsons, 1 share; Pyle 113 shares; petitioner 224 shares.[3]

In September 1954, Rearden and Parsons entered into an agreement with Glacier State which provided that in the event

---

[2] For ease of discussion, we will speak of the Glacier State stock as being held one-half each by Rearden and Parsons.

[3] Because of their one-half interests in Glacier State, Rearden and Parsons each effectively controlled one-third of the GSB stock. The record is not made clear why the stock was not held by Rearden and Parsons individually, but it appears that this was done to facilitate Pyle's eventual acquisition of his one-third interest. Rearden testified at trial that, though discussed many times, the GSB shares held by Glacier State were not distributed to him and Parsons subsequent to the buy-in by Pyle because of "tax reasons."

of either of their deaths, the shares of Glacier State owned by the deceased would be redeemed by that corporation.

In November 1954, Pyle and petitioner entered into three agreements regarding the sale and purchase of the GSB stock. Though Parsons and Rearden were not parties to these agreements, they signed each of them to indicate their approval of the agreements' terms.[4]

The November 1954 agreements were amended by an addendum agreement on January 20, 1969 (the amendment). The amendment provided that upon the death of Pyle, his interest in GSB would be purchased by GSB. The amendment also stated that in the event of either Parsons' or Rearden's death, GSB would redeem the 1 share held in the name of the deceased along with one-half of the stock in GSB owned by petitioner. Worried that the obligations of the various buy/sell agreements might prove burdensome to the eventual obligors, life insurance was acquired on each of the officers of GSB with the proceeds payable to GSB. GSB was required to apply these proceeds to satisfy its various obligations under the amendment.[5] Pyle never signed this amendment, however.[6]

Parsons died on April 10, 1976. As a result of Parsons' death, life insurance in the amount of $52,680.09 was paid to GSB. These proceeds were deposited in a specified account in a local bank. Parsons' widow was executrix for the estate and was a party to all subsequent negotiations. In order to satisfy the obligations of the 1954 agreements and the amendment, a

[4]The first agreement dated Nov. 5, 1954, provided that upon the death of either Parsons or Rearden, Pyle would have the option of purchasing enough shares of GSB from petitioner so that Pyle would own 50 percent of that corporation.

The second agreement, also dated Nov. 5, 1954, provided that petitioner would purchase all of the shares of GSB owned by Pyle upon his (Pyle's) death.

The third agreement dated Nov. 6, 1954, provided that if Parsons or Rearden should sell their stock in petitioner, Pyle would have the option to purchase enough shares of GSB to enable him to be a 50-percent owner in GSB.

[5]If the life insurance proceeds were insufficient to pay the "book value" of the redeemed shares, a 5-year note from GSB bearing 5-percent interest was to be executed for the balance.

[6]Parsons signed for GSB through his capacity as vice president. We assume this was sufficient to bind GSB to the provisions of the amendment. In the event the amendment was unenforceable, however, the November 1954 agreements remain in full force and effect.

Pyle's failure to sign was classified by Rearden at trial as an oversight on Pyle's part. Rearden testified that he and Parsons had always thought Pyle had signed the amendment and the fact that he did not, only became known after Parsons' death. Pyle did not testify at trial.

memorandum of agreement was entered into between petitioner and the Parsons estate in July 1976 which provided a method for the required disposition of the stock in petitioner that was held by the estate. In addition, the small number of shares (see note 11 *infra*) owned by Parsons' widow would be redeemed. Under the terms of this agreement, the value of the Glacier State stock was to be determined by separately valuing: (1) The GSB stock held by petitioner, and (2) all of petitioner's remaining assets. The Parsons estate was to be paid 47.89 percent[7] of the value of the remaining assets, but would receive 50 percent of the value of the GSB stock owned by petitioner.[8]

On August 30, 1977, petitioner, GSB, and the Parsons estate entered into an agreement for the disposition of 112 shares in GSB owned by petitioner, along with the one share owned by the Parsons estate. Petitioner was required under the terms of the agreement to assign to the Parsons estate the redemption payments it received from GSB. Thereafter, two redemptions took place: (1) The stock of petitioner owned by the Parsons estate and Parsons' widow was redeemed, and (2) one-half of the stock of GSB held by petitioner along with the 1 GSB share owned by the Parsons estate was redeemed.

In part payment for the value of the GSB stock, the Parsons estate was assigned a promissory note in the principal amount of $56,576.99 which had been issued by GSB to petitioner on August 30, 1977. Payments on the note were made by means of checks from GSB, made out to petitioner, which were then endorsed over to the Parsons estate.[9] The balance due the estate for the value of the GSB shares was also paid by endorsing to the estate a $56,519.24 check issued to petitioner by GSB.[10]

---

[7] This represented the estate's actual ownership interest in petitioner.

[8] The shares held by Parsons' widow were to be redeemed separately, for which she would receive book value.

[9] The final payment on the promissory note was made by GSB in April 1981 by delivering a check directly to the Parsons estate.

[10] The check represented $52,680.09 from the insurance proceeds on Parsons' life plus interest accrued on that amount from the time of Parsons' death equal to $3,839.15. The check was deposited in a trust account for Betty Parsons (the deceased's wife and beneficiary of his estate) which had been established at a local financial institution.

In the interim period between incorporations and Parsons' death, the shareholder composition of each corporation had been slightly altered through the addition of one minority shareholder to GSB and two to petitioner. For our purposes, their holdings are relevant only in that control of each corporation was no longer solely in the hands of the other shareholders.

Immediately prior to the disposition agreement arranged between the Parsons estate, petitioner, and GSB on August 30, 1977, the stock ownership of GSB was as follows:

|  | Shares |
|---|---|
| Glacier State | 224 |
| Rearden | 1 |
| Parsons estate | 1 |
| Pyle | 113 |
| William Hogan | 35 |

After that disposition, the ownership of GSB was as follows:

|  | Shares |
|---|---|
| Glacier State | 112 |
| Rearden | 1 |
| Pyle | 113 |
| William Hogan | 35 |

After the redemption of the stock of petitioner held by the Parsons estate and Betty Parsons individually,[11] the stock ownership of petitioner was as follows:

|  | Shares |
|---|---|
| Rearden | 364 |
| Betty Rearden | 4 |
| Vernon Moe | [12]12 |
| Art Gunderson | 12 |

GSB had current or accumulated earnings and profits of at least $109,257.08 in 1977. The GSB shares held by P had substantially appreciated while held by petitioner.

---

[11]The total number of issued and outstanding shares of petitioner had at this point increased to 760 (we presume either from a 4-to-1 stock split or stock dividend). At Parsons death, he owned 364 shares of stock in petitioner (a 47.89 percent interest). Betty Parsons owned 4 shares.

[12]Messrs. Moe and Gunderson evidently were either allowed to purchase their 12 shares each from Parsons and Rearden, or else they received them directly from the corporation instead of being distributed in the stock split/dividend. See note 11 *supra*.

OPINION

## Issue 1. The Step Transaction Doctrine

As a result of the GSB redemption, respondent contends that petitioner recognized long term capital gain. Petitioner argues that although the appreciated stock of GSB was technically owned approximately one-third by Pyle and two-thirds by itself; Parsons, Rearden, and Pyle (hereinafter referred to as the officers) treated the stock for all intents and purposes as being owned by them individually. Therefore, petitioner claims that the substance of the transactions was that the GSB stock had been transferred to the Parsons estate as part payment for the redemption of petitioner's stock, followed by a redemption of that GSB stock directly from the estate.[13]

Respondent's answer to this contention is that in this case, the substance of the transactions was its form: that Glacier State satisfied its obligation under the buy/sell agreements to redeem its stock from the Parsons estate by selling one of its assets, i.e., one-half of the GSB shares it held. We hold for respondent as to issue one.

We agree with petitioner that it is the substance of a transaction rather than mere form which should determine the resultant tax consequences when the form does not coincide with economic reality. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Higgins v. Smith*, 308 U.S. 473 (1940); *Foster v. Commissioner*, 80 T.C. 34, 201 (1983); *Gray v. Commissioner*, 56 T.C. 1032 (1971). The taxpayer, as well as the Commissioner, is entitled to assert the substance-over-form argument although in such situations taxpayers may face a higher than usual burden of proof. *Landa v. Commissioner*,

---

[13]Structured in this way, no tax would be owed by any party. The estate would have taken a fair market value basis in the Glacier State shares that were owned by Parsons. Sec. 1014(a) and (b)(1). Consequently, no gain would be attributed to the estate on the Glacier State redemption, and the estate would take a cost (see sec. 1012) basis in the GSB shares. Therefore, the later redemption of the distributed GSB shares directly with GSB would produce no income to the estate because the basis of the shares would equal their fair market value. As the estate would be terminating its entire interest in petitioner, petitioner would have no income on the distribution of the GSB shares in redemption of its own stock under sec. 311(d)(2)(A). Sec. 311(d)(2)(B) might also apply. Compare Rev. Rul. 83–38, 1983–10 I.R.B. 10, 11.

206 F.2d 431, 432 (D.C. Cir. 1953); *Ciaio v. Commissioner*, 47 T.C. 447, 457 (1967).

To assure that the substance of transactions will be determinative, courts have employed the "step transaction" doctrine. The essence of the doctrine is that an integrated transaction will not be broken down into independent steps; or, viewed from the other side, separate steps must be taken together in attaching tax consequences if that combination is the substance of the transaction. *American Wire Fabrics Corp. v. Commissioner*, 16 T.C. 607 (1951); *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 474, 418 F.2d 511, 516 (1969). See *Security Industrial Insurance Co. v. United States*, 702 F.2d 1234 (5th Cir. 1983).

To justify its invoking the doctrine to find the true substance, petitioner points to numerous facts and claimed facts. At the center of its argument is its claim that "the (officers) treated the GSB stock as being owned by the three of them as individuals." To support its claim, it points out: (1) The Parsons estate negotiated directly with GSB to determine the value of the GSB shares which petitioner would redeem, though it negotiated with petitioner as to the value of its remaining assets; (2) the estate received 50 percent, of the value of the GSB stock held by petitioner even though the estate held only a 47.89-percent interest in Glacier State; and (3) all the payments for the GSB stock were required to be assigned and in fact were endorsed directly to the estate. Therefore, petitioner contends that it received no economic benefit from the GSB redemption and the resulting tax consequences should be attributed to the entity whom petitioner claims is the real seller of the stock—the Parsons estate. In short, petitioner claims it was merely a conduit through which the proceeds passed. We disagree.

To accept petitioner's argument that it was merely a conduit would require us to determine that the real owners of the GSB stock were the officers. This we cannot do. Such a determination necessarily requires that we ignore petitioner's existence as a taxable entity. Despite petitioner's strong urging, the facts are clear that not only was Glacier State in substance the "real" owner of the stock for over 20 years, but also that Parsons and Rearden did in fact accept it as such. Rearden testified at trial that he and Parsons had discussed holding the

GSB shares in their individual capacity many times, yet did not do so for tax reasons. Such a statement necessarily implies that they believed that they were not the owners. Also, if Parsons and Rearden thought that they owned the stock, why did they observe all the technical formalities during the execution of the buy/sell agreements, the amendment to those agreements, and the later redemptions? The answer must be that Parsons and Rearden thought that petitioner was the true owner.

That the Parsons estate negotiated directly with GSB to set a value for the GSB shares does not lead to a different conclusion. Considering the close relationship between the corporations and the principals involved, such negotiations do not strike us as unusual. We find it hard to fathom how the redemptions could have been structured *without* the presence of direct negotiations between the estate and GSB. That they were done in this manner does not influence us to accept petitioner's claim.

We are similarly not persuaded that the slightly disproportionate redemption of the GSB stock compared with the estate's ownership interest in all of the Glacier State assets should indicate Parsons and Rearden were the "true owners" of GSB. The number of GSB shares to be redeemed was set by the provisions of the buy-out agreements, not the negotiations for the redemption of the Glacier State shares.[14] We may assume that the 50-percent figure was chosen to reflect the substantive ownership interests at that time, and was retained merely for mathematical convenience.[15]

---

[14]Only the *value*, not the number of GSB shares to be redeemed, was negotiated.

[15]The subsequent additions of new stockholders in either company would alter the proportionate ownership interests in GSB stock. If Rearden and Parsons justifiably believed themselves to be one-third owners in GSB, they would have insured against this lessening of their proportionate interests because it might threaten their control.

For example, just before Parsons' death GSB was owned by greater than four shareholders with approximately two-thirds held by petitioner and one-third by Pyle. If Pyle disagreed with Parsons regarding company policy but agreed with Rearden, his and Rearden's votes, if the shares were held individually, would comprise a majority. Since about two-thirds of the GSB stock was held in petitioner's corporate solution, however, a deadlock would occur as to how to vote petitioner's shares (attributable to Rearden's and Parsons' equal holdings in Glacier State). That deadlock could only be broken by the remaining shareholders in Glacier State. It would be impossible to conclude, therefore, that Parsons and Rearden "treated" the GSB stock as owned by them individually, as their control rights in GSB were never exercisable in that form.

We now turn to petitioner's final point, that all the proceeds from the sale were endorsed directly to the Parsons estate. Petitioner argues that this fact, coupled with its claim that it received no gain or profit on the transaction, falls squarely within the precedent of *Fox v. Harrison*, 145 F.2d 521 (7th Cir. 1944). We disagree.

In *Fox v. Harrison*, a corporation was owned in one-third and two-thirds shares by two individuals. The majority shareholder threatened termination of the corporation if his interest was not bought out. The corporation, however, was financially unable at that time to purchase all of his stock, nor was it able to obtain a bank loan to do so. The bank would only make a personal loan to the remaining shareholder to finance a purchase by him. Later, the corporation's financial situation improved, and it redeemed the recently purchased shares from the remaining (now sole) shareholder. The corporate checks given in payment for the redeemed shares were endorsed over as payment on the loan. The trial court held that the real purchaser of the stock was the corporation, not the remaining shareholder, and accordingly, the remaining shareholder did not experience dividend treatment on the subsequent redemption. The Court of Appeals affirmed on the basis that there was sufficient evidence to support the trial court's findings.

First, the petitioner here did receive economic gain from the transaction. Upon Parsons' death, it incurred a liability under the buy/sell agreements to redeem its own stock from the estate. It extinguished that liability through the sale of one of its assets, the appreciated GSB stock. In *Fox v. Harrison*, however, there was no such pre-existing liability, nor was the stock which was surrendered by the taxpayer the same stock it had previously held.

Second, the decision in *Fox v. Harrison* was limited to an ascertainment of whether there was any rational basis for the findings made by the trial court. Noting among other facts that the proceeds were directly paid over, the Court of Appeals decided there was substantive support for the opinion of the trial court. Because establishing such support was the underlying purpose of that Court's decision, we think *Fox v. Harrison* is readily distinguishable. Moreover, we think the fact that the proceeds were paid *through* petitioner rather than directly to

the estate is further proof that Rearden acknowledges petitioner as the true owner of the stock, not the officers.[16]

The additional cases relied upon by petitioner[17] are similarly distinguishable. In most of them, as in *Fox v. Harrison*, an original plan of action had to be abandoned because of overriding business or economic reasons. The respective courts determined that the substance of the transactions corresponded to the original plan and not the substituted form. But in the instant case, no alternative form was planned or even contemplated until after the transactions were consummated.

Furthermore, petitioner's reconstruction of the transaction is inherently inconsistent. To establish that the step transaction doctrine is appropriate, petitioner asserts that the officers were the owners of the GSB stock and it (petitioner) was only a conduit. But under the distribution/redemption scenario that petitioner argues really occurred, Glacier State had to be the owner of the stock in order to qualify for the nonrecognition treatment provided by section 311(d)(2)(A) on the distribution of the GSB shares. Glacier State's existence as a separate taxable entity cannot be ignored at one moment and respected the next.

In sum, the fact that Rearden and Parsons may have deemed themselves the owners of the GSB shares because of their control over Glacier State is insufficient to establish that they were the actual or true owners of such shares.

Although we agree with petitioner that where appropriate, under the step transaction doctrine, separate steps must be taken together in attaching tax consequences, this is not a correct case in which to apply that doctrine. Petitioner is not asking us to skip, collapse, or rearrange the steps he employed. See *Harris v. Commissioner*, 61 T.C. 770, 783 (1974). He is instead asking that we accept an entirely new series of steps or

---

[16]We are aware that the last payment on the note was made directly to the estate. However, we attach little weight to this change as it occurred well after the notice of deficiency was issued. In addition, the fact that the last payment was made directly to the estate also indicates that there was no significant legal barrier to structuring all payments this way.

[17]*Ciaio v. Commissioner*, 47 T.C. 447 (1967); *Decker v. Commissioner*, 32 T.C. 326 (1959), affd. 286 F.2d 427 (6th Cir. 1960); *Erickson v. United States*, 189 F. Supp. 521 (S.D. Ill. 1960).

events that did not take place. The step transaction doctrine cannot be stretched so far.

Despite petitioner's present objections, in essence it is merely arguing that since the transaction would have been nontaxable if cast in another form, we should grant similar treatment to the form it utilized. This we cannot do.

The cornerstone of tax planning is that the same economic or business result may be validly achieved through a variety of routes, each with differing tax consequences. The step transaction doctrine may be argued by taxpayers in cases where the form chosen does not reflect that transaction's true substance (which is reflected in the combining of the individual steps). This is to be distinguished, however, from situations where, as in the instant case, the substance of the transaction coincides with the form employed. In such situations, it is well-settled that:

while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not. [*Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974); citations omitted.]

This Court also views with disfavor attempts by taxpayers to restructure transactions after they are challenged. *Hoover Co. v. Commissioner*, 72 T.C. 206, 248 (1979); *Legg v. Commissioner*, 57 T.C. 164, 169 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974); *Acro Manufacturing Co. v. Commissioner*, 39 T.C. 377, 385 (1962), affd. 334 F.2d 40 (6th Cir. 1964), cert. denied 379 U.S. 887 (1964).

Accordingly, we conclude that in both form and substance, the two redemptions occurred here as they were originally cast, and that the step transaction doctrine is of no aid to petitioner.

## Issue 2. Series of Redemptions

In the alternative, petitioner asserts that the payments it received from GSB should be treated as dividend income. If characterized as a dividend, 85 percent of the distribution qualifies for a deduction from petitioner's gross income under section 243(a).

Petitioner claims that because there was a planned later redemption of Pyle's GSB shares upon his death, pursuant to the agreements, this constitutes a series of redemptions under section 302(b)(2)(D). It contends that by taking this later redemption into account, the present distribution fails the substantially disproportionate tests of section 302(b)(2), or is essentially equivalent to a dividend and hence does not qualify under section 302(b)(1).

Respondent argues that since Pyle did not sign the amendment to the buy/sell agreements, the November 1954 agreements are still in effect. Under these agreements, Pyle's estate is required to sell all its GSB shares upon Pyle's death to *petitioner* (see note 4 supra). Thus, respondent contends that such a sale could not qualify as one of a series of *redemptions*. See sec. 317(b). He also contends that the distribution is "not essentially equivalent to a dividend" within the meaning of section 302(b)(1) because a dividend represents a pro rata distribution out of corporate earnings and profits,[18] which was not the case here; or because there was "a meaningful reduction as to the shareholder's proportionate interest in the corporation," quoting *United States v. Davis*, 397 U.S. 301, 313 (1970). We agree with respondent for the reasons stated below.

The proper tax treatment to be afforded to the distribution from a corporation in redemption of its stock depends upon whether section 302(a) applies. If the distribution does not qualify under section 302(a), section 302(d) directs that section 301 will apply.[19]

Under section 302(a), a redemption is treated as an exchange if any of the numbered paragraphs of section 302(b) are met. The parties apparently agree that, viewed separately, the GSB redemption satisfies both the 50- and 80-percent tests of section 302(b)(2).[20]

---

[18]See sec. 316(a). See also *Wright v. United States*, 482 F.2d 600 (8th Cir. 1973).

[19]If sec. 301 applies, the distribution will qualify as a dividend because adequate earnings and profits were available. Sec. 301(c)(1).

[20]After the redemption, petitioner owned 112 out of a total 261 shares (42.9 percent). This is less than 50 percent of the total number of outstanding shares and also less than 80 percent of the ratio of the amount of stock petitioner held before the redemption to the total number of shares before the redemption (224 out of 374, or 59.89 percent).

The main question then is whether we should view the "redemption" of Pyle's shares along with the GSB redemption as part of a single plan under section 302(b)(2)(D).

Section 302(b)(2)(D) provides:

This paragraph [par. 2 of sec. 302(b)] shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

We agree that the GSB redemption was made pursuant to a *plan*.[21] However, we think it plain that the plan's purpose was not a series of redemptions that eventually would result in a distribution which in the aggregate is not substantially disproportionate with respect to the shareholder.[22]

The regulations state that whether a plan with the requisite purpose or effect exists is to be determined from all the facts and circumstances. Sec. 1.302–2(a), Income Tax Regs. Little authority is available that directs us as to which facts should be weighted more than others in resolving this issue.[23] There is no clear indication of how close in time the redemptions must occur in order to constitute a series, or whether a plan to make a series of distributions might exist without a contractual requirement that it be carried through. J. Mertens, Law of Federal Income Taxation, Code Commentary, sec. 302(b)(2):2 (1983). See note 21 *supra*.

The purpose for enacting section 302(b)(2)(D) was to prevent an obvious abuse of the 50-percent and 80-percent tests of section 302(b)(2). See S. Rept. 1622, 83d Cong., 2d Sess. 234, 235 (1954); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.22, at 9–20, 21 (4th ed.). We do not think the facts of the instant case show that the

---

[21]While Pyle did not sign the amendment to the buy/sell agreements, adequate evidence was presented that an oral contract may have existed between Pyle and the corporations. In addition, the terms of the amendment have been fulfilled by all parties, including Pyle, in carrying out those provisions affected by Parsons' death. However, in light of our decision above, we need not decide if the amendment was enforceable against Pyle.

[22]If we accepted petitioner's present argument, the distribution would not qualify as substantially disproportionate, because petitioner's percentage of stock ownership would increase to approximately 99 percent after GSB had redeemed Pyle's shares.

[23]We note that *Roebling v. Commissioner*, 77 T.C. 30, 53 (1981); *Johnston v. Commissioner*, 77 T.C. 679, 685–686 (1981); and cases cited therein address whether such a plan exists under sec. 302(b)(1) or (3). We think those decisions are inapplicable to the present case, since the express language of sec. 302(b)(2)(D) states that it applies only for purposes of sec. 302(b)(2).

buy-out plan's "purpose or effect" was to result in a substantially proportionate distribution. Clearly, the plan's purpose was merely to prevent unapproved parties from acquiring an interest in GSB and also to provide a market for the shares upon the death of the deceased. This plan, as with most buy/sell agreements concerning closely held corporations, represents legitimate business purposes.[24] Obviously, this was not a vehicle in which to bail out earnings of the corporation at capital gain rates.

Moreover, we cannot agree that the overall effect of this plan would not be a substantially disproportionate distribution. The second redemption required to establish the series has not, and may never, occur. In the interim period, the corporation could dissolve, Pyle could sell his shares to qualified third parties, the parties may rescind the agreements, or sufficient additional shares may be issued to other shareholders, thereby diluting Pyle's holding to an insignificant amount. We conclude, then, that petitioner's redemption of one-half of the GSB shares satisfies the substantially disproportionate tests of section 302(b)(2)(B) and (C).

Petitioner also claims that the GSB redemption is essentially equivalent to a dividend and hence fails to qualify for exchange treatment under section 302(b)(1).

Because that redemption vastly altered the control rights in GSB, the distribution obviously does not qualify as a dividend. *United States v. Davis, supra.* Compare *Paparo v. Commissioner*, 71 T.C. 692 (1979); *Benjamin v. Commissioner*, 66 T.C. 1084 (1976), affd. 592 F.2d 1259 (5th Cir. 1979).

Accordingly, since the requirements of sections 302(b)(2) and 302(b)(1) were met, the transaction is afforded exchange treatment. The GSB redemption therefore results in capital gain to petitioner.

To reflect concessions made by the parties and our conclusions herein,

*Decision will be entered under Rule 155.*

---

[24]We are mindful of the Supreme Court's admonition in *United States v. Davis*, 397 U.S. 301 (1970), that business purpose is irrelevant in determining whether a distribution is essentially equivalent to a dividend. But here we are attempting to determine whether there was a plan possessing such a purpose or effect. Such a discussion is therefore relevant. *Roebling v. Commissioner, supra.*